IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )
                                     )
v.                                   )            No.  06-10116  -01, -02
                                     )
MINH DUC VO,                         )
and THANH H. BUI,                    )
                                     )
                    Defendants.      )
                                     )

**Memorandum and Order**

     This matter came before the court on September 26, 2006, for an evidentiary hearing on the defendants' motions to suppress evidence.  The court took the motions under advisement at the conclusion of the hearing.  Having reviewed the evidence -- including the videotape of the traffic stop giving rise to the motions -- the court is prepared to rule.  For the reasons stated herein, the motions to suppress are denied.

     I.  *Summary of Facts*.

     On May 13, 2006, a little after 7:00 p.m., Kansas Highway Patrol Trooper David Heim was on duty monitoring traffic at a toll booth of the Kansas Turnpike (Interstate 35) near Wellington, Kansas.  Heim was in his patrol car near the turnpike's southern terminal.  He was facing north so he could watch the on-coming southbound traffic, when he saw a white or light-colored Cadillac Escalade approach.  The two southbound lanes of interstate in this area expanded to six lanes to allow drivers to choose any of six toll booths.  There were one or two additional lanes on the west edge of the roadway for cars with an electronic pass ("K-Tag").  The six lanes in front of the toll booths were marked by ordinary lane dividers (intermittent stripes) for a short distance.  Two of the

toll booth lanes were closed.   As the Escalade approached the toll booths, Heim saw it move to the left (east) on the roadway, across one or two lane lines, without signaling.

Heim believed the driver had violated Kansas law by failing to signal, so he pulled his car around to follow the Cadillac.  He noticed that the car had a temporary cardboard or "paper" license tag.  Heim waited for the driver to pay the toll, and after the Escalade pulled through the toll booth Heim honked his horn and motioned for the driver to pull over.  The driver complied, pulling over to the shoulder on the east side of the roadway (the left side from Heim's perspective, as he now faced south).

Heim had turned on the video and audio recording equipment in his vehicle, so a recording of the stop was made.  *See* Govt. Exh. 1.  Heim got out and walked to the driver's side of the Escalade.  As he did so he read the portion of the temporary tag which stated that it was for a "Texas Buyer Untitled Vehicle."  Heim was generally familiar with temporary tags but had not seen one like this before.  Heim spoke to the driver, defendant Minh Duc Vo.  Mr. Vo was accompanied by defendant Thanh H. Bui, who was sitting in the front passenger seat.  Both occupants were young males.  Heim explained that he made the stop because of the failure to signal and added that he was trying to figure out the tag on the car.  He asked Vo for his driver's license and then asked him to step out behind the Escalade so they could talk.  Vo got out and produced a Texas driver's license in the name of "Lan Kim Le."  As they stood behind the Escalade, Heim asked Vo [whom he believed to be "Lan Kim Le"] about the vehicle's tag and about Vo's travel plans.

Vo was very fidgety, and he kept moving to Heim's left side.  Vo did this two or three times, causing Heim to be concerned for his safety, because Vo's movements were causing Heim to turn his back to the Escalade and the passenger in the car.  Heim told Vo he needed to stand in one spot.

2

Heim asked who owned the car, and Vo responded by saying "Ann" [Anh].  When Heim asked for

a last name, Vo hesitated, and then said it was Anh Dang.  Vo subsequently produced an insurance

card showing that "Anh Dang" had insured the vehicle.  Heim noticed that the temporary tag on the

vehicle was a "Texas Buyer Untitled Vehicle" tag with an expiration date of June 1, 2006.  It stated

that the "date sold" for the vehicle was May 4, 2006.  The tag indicated the car had been sold by

Allstate Motorcars in Houston, Texas, and that the buyer was "Tommy Le."  It listed the Vehicle

Identification Number (VIN).  The tag also stated that the dealer must apply for title and registration

within 20 working days from the date sold.  Heim asked Vo about where he had been and where he

was going.  Vo said he had been in Wichita about a week or five days, where he had attended the

wedding of a friend.  He said he was going to drop off his passenger, whom he identified as Thanh

Bui, in Oklahoma City.  When Heim asked how he knew Bui, Vo said, "from the wedding," and

added he had known him for a long time.  Heim subsequently went to speak to Mr. Bui and to check

the Vehicle Identification Number (VIN) through the front windshield.  Heim asked Bui if he any

registration or anything for the car, but Bui said he didn't know.  Heim asked if he had any

identification, and Bui produced a Missouri driver's license.  Heim asked Bui several questions

about his travel.  Bui told Heim he had flown from Oklahoma City to Kansas City for his little

sister's graduation, although he had been unable to attend the graduation.  He said Vo had come to

Kansas City to pick him up and was driving him back to Oklahoma City.  Heim noticed that Bui had

a tattoo that went from his neck all the way down to the lower part of his arm.  Heim thought the

tattoo looked similar to street gang tattoos he had seen or read about, and he was somewhat

concerned for his safety.  Heim was suspicious for a number of reasons.  He knew from training and

experience that drug traffickers frequently use one-way air travel with a return trip by automobile

3

to transport drugs.  He found Bui's explanation to be odd, given that he had supposedly flown to Kansas City for a graduation but apparently did not attend the ceremony.  He also noted conflicts in the men's stories, such as the fact that Vo said they had met up at a wedding in Wichita but Bui indicated "Le" had picked him up in Kansas City.  Heim was also concerned that the temporary tag was a kind he had never seen, and that the person whom Vo identified as the owner was not present.

Heim went back and radioed in a request for a driver's license check and a Triple III (criminal history) check on both men.  He then asked Vo if he had any other paper or anything for the car.  Vo said the registration was in the center console.  Vo started to move to the car, apparently to get the document, but Heim told him to stay put.  Instead, Heim went to talk to Bui and told him Vo said the registration might be in the console.  Bui looked but could not seem to find it.  Heim asked Bui if he had any documents showing the purchase of the car.  While Bui was looking, Heim, who was outside the driver's window, noticed the screws in the center console.  Heim had extensive training in drug interdiction, including training in how to detect hidden compartments.  He had personally been involved in about 20-25 stops where hidden compartments had been located, and in the course of his experience he had seen probably a hundred or more such compartments.  He knew it was not uncommon for traffickers to hide drugs under the console.  He was aware that on some vehicles drug traffickers could take the screws out of the  console, lift up the console "bucket" and hide drugs in a natural void underneath.  Heim testified he could see tool marks on the console screws, which indicated to him someone "had been messing with the console" and had taken it out.

Bui looked in the passenger compartment but could not find a registration.  He produced various other documents.  One was a warning citation from the Texas Department of Public Safety issued to "Kahn Minh Nguyen" in Chamber County, Texas, on April 30, 2006.  The warning was

for an expired registration on a "Cadillac SU." Heim asked Bui if he knew whose car the Escalade was; Bui said no. Heim asked Bui more questions about his travel to Kansas City and Wichita. At some point Bui produced a document pertaining to the Escalade entitled "Ready for Delivery." The dates on that document, as well as the other documents given to Heim, indicated that the original temporary tag for the vehicle must have expired and a new temporary tag had been issued. The document may have identified Anh Dang as the purchaser of the vehicle.[1]  At this point, Heim believed that the tag on the vehicle was likely either fraudulent or had been improperly reissued. Heim spoke again with Vo and asked him further about the tag. Vo asserted at some point that the original tag had expired but had been reissued by the dealer. Heim believed it was unlawful for the dealer to reissue the tag as Vo had asserted. At some point Heim received a report back from dispatch indicating that the two driver's licenses were valid and there were no wants or warrants for either man, but that Bui had prior arrests including one for possession of a saw-off shotgun. After receiving that report, Heim called for backup to assist him. Heim sat in his car for a few minutes trying to figure out the documents. He noted that the Texas citation for expired registration was issued to an individual with a Louisiana license, and that the citation had been issued after the date of purchase (March 31, 2006) indicated on other documents. One of the other documents from the car indicated that repairs had been performed on the vehicle on May 8, 2006, under the name of "Mike Nguyen."

Heim spoke again with Vo about the license and about his travel. When Heim asked when the wedding was, Vo initially indicated it was the previous  "Saturday or Sunday," and then said it

---

[1] There was testimony about this document at the suppression hearing but it was not introduced into evidence.

was Sunday.  He said he gotten the car in Austin that Sunday and had driven to Wichita the same day to attend the wedding.  He told Heim Bui had not attended the wedding.  Heim and Vo discussed whether it was lawful for a dealer to reissue a temporary tag of this sort, with Heim insisting that a dealer could only issue a tag of this type one time.  Heim was growing somewhat frustrated at the absence of a document clarifying the license issue, and he returned to ask Bui what he knew about the tag, opening the passenger door as he did so.  Bui said he didn't know about it.  Heim asked if there were any more papers in the car, but Bui said he had looked through everything.  The videotape indicates that at this point, about 7:26 p.m. (15 minutes or so after the initial stop), Heim leaned into the passenger compartment to look for or examine papers pertaining to the car.  Heim noticed that among the documents Bui handed him was a receipt from the Best Western Airport Inn motel in Wichita.  The receipt was for May 11, 2006 (two nights prior) and was in the name of "Minh Duc Vo."  Heim asked Bui if he knew Minh Duc Vo; Bui said he did not.

Heim told Vo he was unsure whether it was lawful for them to drive the car and that he might have it towed.  Vo attempted to explain that the owner had problems financing the car and the dealer had reissued the temporary tag.  Heim again told Vo that a dealer could not reissue a tag of this type.  At one point or another, both Vo and Bui suggested that Heim could call the owner, Anh Dang, but Heim declined to do so, saying he had no way of knowing whether it was in fact the owner.

After Heim's limited initial search failed to produce any document clearing up the license issue, Heim waited for his backup to arrive.  Trooper Roubideaux arrived a short time later, at about 7:33, which allowed Heim to investigate and search without having to worry about watching the two individuals.  Heim had Bui get out of the Escalade and wait with Trooper Roubideaux.  Heim patted Bui down as he got out of the car.  Heim then looked in the front passenger area of the Escalade for

6

additional documents.  Heim then removed the temporary tag from the rear of the Escalade and examined it.  He noted that the tag listed the buyer as "Tommy Le," not Anh Dang as Vo had claimed.  When Heim asked Vo about it, Vo said that Tommy Le was the American name for Anh Dang's father.  Heim and Vo again argued about whether or not the re-issuance of the temporary tag was lawful, with Heim pointing out that he couldn't accept the tag at face value with all these problems because "any jackass with a color printer" could print such a tag.

Heim subsequently conducted a more thorough search of the passenger compartment for documents, both front and back seats.  When he initiated this search, Heim again saw that the screws in the console were marked up from being used.  Based on his experience, Heim believed the screws did not come from the manufacturer with such marks.  The marks indicated to him the console had been removed.  Heim also lifted up the rear hatch of the car and looked through the items in back.  He also looked underneath the vehicle in a couple of spots and examined the door panels and other areas to see if there were any hidden compartments in the vehicle.  Heim subsequently retrieved a screwdriver from his car and returned to take the screws out of the console.  He pried up the console "bucket" so that he could see underneath.  From his search Heim could see packaging material containing pills in the void under the console.  At some point Heim popped out a stereo control in the console to make it easier to get the packages out.  Heim recognized the pills as likely containing MDMA ("ecstacy").  He then placed the defendants under arrest, and subsequently gave them their Miranda rights.

At the suppression hearing, defendant Vo called Anh Dang as a witness.  Ms. Dang testified that she and her step-father, Tommy Le, purchased the Escalade and are the co-owners of it.  The defense introduced through Ms. Dang an application for certificate of title showing that she and

Tommy Le were listed as the owners of the vehicle.  Ms. Dang testified that she obtained the insurance for the vehicle in her name.  She testified that she wrote a check for $4,000 as a down payment when the vehicle was purchased on May 31, 2006, and that she was given a cardboard license plate by the dealer.  She said her check bounced, however, and the original temporary tag subsequently expired.   She and her father reached an accommodation with the car dealer's agent, Andy Thieu, who told them to bring the car in and he would give them an extension tag.  She did so, she said, and Thieu gave her the new temporary tag.  Dang said the car had forty-some thousand miles on it when she and Mr. Le purchased it, and that it cost about $32,000.  She testified the car was financed through HSBC Motor Credit, which is listed on the title application as a lienholder, and she said that her first payment was late and that it was made a little after April 15, 2006.  Ms. Dang graduated from Baylor University in the summer of 2006.  She works for her mother in her mother's restaurant.  She testified that after the purchase she was down at Baylor finishing up school and did not need the car because she had another vehicle available.  She said Tommy Le used the car to drive to California and back to attend to some business for about a week.  She testified that after her father used the car, the defendant Minh Vo, a very good friend whom she had known for about five years, asked if he could use the car, and she told him he could.  She testified Vo did not tell her where he was going and she did not ask.  She said he borrowed the car about five or six days before he was stopped by the highway patrol. When asked on cross-examination whether she told Vo he could take the vehicle out of state, Ms. Dang said no but added she did not tell him he couldn't.  She said Vo did not tell her he was taking Bui with him.  When asked about the various documents from the car, Dang said she did not know any "Kahn Nguyen," and although she knew some guys named "Mike Nguyen" she did not loan the car to any of them.  She said as far as she

knew Tommy Le and Minh Vo were the only ones to use the car from when she purchased it until Vo was stopped.  She further testified that when she got the car back after Vo's arrest, she found some screws on the back floor.  Ms. Dang testified that she provided the screws to Mr. Vo's counsel (Def. Exh. Vo B), and that she was pretty sure they came from the console.

II.  *Summary of Arguments*.

Defendant Vo contends that Trooper Heim's searches of the Escalade violated his Fourth Amendment rights.  Vo contends Heim engaged in several searches, including: two "visual searches" while standing outside the driver's side door; an entry into the vehicle at 7:25 or 7:26 p.m. to examine the contents of the console; entry into the vehicle to remove documents from console between 7:33 and 7:35;  a search between 7:38 and 7:39, and then 7:38 to 7:48 p.m., when Heim searched the entire car.  Vo argues that even assuming Heim had a reasonable suspicion that the tag had expired or the vehicle was not properly registered, he had no probable cause to search the vehicle.  Moreover, Heim exceeded the scope of any probable cause, he argues, because the proper scope of a search is limited by its object and "[i]t is unlikely indeed that registration papers would be located on the floor of the rear passenger compartment, underneath the drivers seat, underneath the car in luggage and packages contained with the rear deck of the vehicle and in all other place[s] searched by Heim other than the console or the glove compartment."  Doc. 20 at 9.  At the suppression hearing Vo submitted a copy of the Texas Transportation Code and argued that under Section 503.063, a dealer in Texas is authorized to issue an additional temporary cardboard tag after issuance of the original one, with the extension good for 21 days after issuance.  As such, Vo appears to argue that the officer did not have probable cause to believe any registration offense had been committed.  Moreover, Vo contends the evidence established that he has standing to challenge

the search of the vehicle because he showed that the owner of the vehicle loaned it to him.  Vo contends the officer's searches were unreasonable and that all evidence obtained as a result thereof, including Vo's statements after arrest, must be suppressed.

Defendant Bui likewise argues that his Fourth Amendment rights were violated.  He contends the initial stop of the vehicle was unlawful because the defendants did not commit a turn signal violation.  Bui further contends the ensuing detention was unlawful because it exceeded the permissible scope of a traffic stop.  Bui contends the officer's suspicion about the temporary tag was based on an erroneous belief of the requirements of Texas law, and that no criminal offense occurred. *Citing United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003) (a mistake of law, even if reasonable, cannot reasonable suspicion or probable cause).  At best, Bui contends, Vo might have been ticketed for failing to produce the registration, but Bui contends the Kansas law does not make that a crime and, at any rate, Heim said he was not going to ticket Vo for the registration, and therefore Heim had to either issue a traffic ticket or end the detention.  Bui also argues that the trooper engaged in a search that was clearly not for the purpose of finding registration papers, as shown by the fact that he looked under the vehicle and dismantled the console.  Bui contends Heim did not have reasonable suspicion sufficient to justify any further detention.  He also claims the officer did not see the alleged marks on the console screws until after he engaged in an illegal search of the vehicle.  Bui argues that all evidence obtained from the stop must be suppressed.

For its part, the Government argues that both defendants lack standing to object to the search of the vehicle.  It contends that Bui, as the passenger, had no reasonable expectation of privacy.  As for Vo, it concedes that Ms. Dang's testimony might have established Vo had lawful possession of

the vehicle, but it asserts that he failed to show he had a subjective expectation of privacy in the vehicle. The Government contends the initial traffic stop was lawful, asserting that K.S.A. § 8-1548 requires a signal of intention for a vehicle that moves right or left on the roadway. *Citing United States v. Ortega*, 379 F.Supp.2d 1177 (D. Kan. 2005). It argues that the officer had a reasonable suspicion sufficient to justify an investigative detention based on the totality of circumstances, including the defendants' inability to produce a valid registration, the defendants' conflicting and implausible travel plans, and the circumstances indicating the temporary tag had previously expired and may have been fraudulent. Finally, the Government argues that the officer was lawfully present in the Escalade searching for proper documentation when he noticed worn and scratched screws in the console. The Government argues that this knowledge, together with all the other circumstances, gave the trooper probable cause to believe there was contraband in the console and justified a search of it. The Government thus contends the defendants' fourth amendment rights were not violated.

III. *Discussion*.

A. *Traffic stop and detention*. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The temporary detention of an individual for a traffic violation constitutes a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). Under Tenth Circuit law, routine traffic stops are analyzed under the standards for investigatory stops announced in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir.1998). The reasonableness of such stops are evaluated in two respects: first, whether the officer's action was justified at its inception, and, second, whether the stop is reasonably related in scope to the circumstances that first justified the interference. *United States v.*

*Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir.1994) (*citing Terry*).

As to whether a stop is initially justified, the courts have made clear that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir.1995) (*en banc*); *Whren v. United States*, 517 U.S. 806, 818 (1996). In this instance, the court has no problem concluding that Trooper Heim had probable cause to believe the driver of the Escalade committed a traffic violation by failing to signal his movement (including a change of lanes) as he approached the toll booths. As the Government points out, K.S.A. § 8-1548 provides in part that "[n]o person shall turn a vehicle *or move right or left upon a roadway* unless and until such movement can be made with reasonable safety, *nor without giving an appropriate signal in the manner hereinafter provided*." (Emphasis added). Trooper Heim's testimony supports a finding that he observed the Escalade move to the left across the roadway -- and that it crossed a lane line when it did so -- without signaling its movement. Under the circumstances, the officer had probable cause to believe a traffic violation had occurred. *Cf. United States v. Ortega*, 379 F.Supp.2d 1177, 1183 (D. Kan. 2005) (statute covers lane changes as well as moving left or right on roadway; "roadway" includes the portion of highway ordinarily used for vehicular travel).

Insofar as the appropriate scope of a traffic stop is concerned, the Tenth Circuit has consistently held that an officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir.1994). An officer may ordinarily ask questions relating to a driver's travel plans without exceeding the scope of a traffic stop. *United States v. Williams*, 271 F.3d 1262,

1267 (10th Cir. 2001).  The officer may also obtain information regarding the detainee's criminal history.  *See United States v. McRae,* 81 F.3d 1528, 1536 n. 6 (10th Cir.1996).  Thereafter, if the driver has produced a valid license and proof that he is entitled to operate the car, he generally must be allowed to proceed on his way without being subjected to further delay for additional questioning.  *Id*.  This follows from the principle that an investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification.  *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997).  Further questioning is permissible, however, if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring.  *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993).

In this instance, the trooper clearly had a reasonable suspicion of criminal activity, based on specific and articulable facts, that justified an investigatory detention.  Although Vo (posing as "Le") produced a seemingly valid driver's license, he and Bui were unable to produce documentation showing that the vehicle was properly licensed and/or registered such that it could be lawfully operated upon the roadway.  Vo had a document showing that "Anh Dang" insured the vehicle, but Dang was not present, and the mere fact she insured the car would not prove lawful ownership or that the vehicle was properly licensed.  Vo claimed there was a registration in the console of the car but Bui could produce no such document.  It is unclear whether there was an actual bill of sale in the vehicle showing that the vehicle had been sold to Ms. Dang.[2]  At any rate, as the stop progressed

---

[2] As noted previously, the "Ready for Delivery" document testified to by Trooper Heim at the suppression hearing was not introduced as evidence.  The evidence from the hearing indicates this document may have identified Anh Dang as the prospective or actual purchaser of the Escalade.  Even if the document did establish the identity of the vehicle's purchaser, it would not vitiate the officer's probable cause to believe a misdemeanor registration violation had been committed.

the trooper was provided documents that only raised additional questions about the legitimacy of the vehicle's temporary license, such as the Texas warning citation issued on April 30, 2006 for an expired registration.  The trooper was appropriately suspicious that a registration offense pertaining to the vehicle was being committed.  Additionally, the trooper's routine questions to the two men about their travel plans produced sometimes conflicting and suspicious information in response.  For example, Vo initially indicated he had met up with Bui at a wedding in Wichita, but Bui's statements indicated he had not been to the wedding.  Vo later appeared to contradict his own statement when he said Bui had not been at the wedding.  Bui's account of his travel -- a one-way flight from Oklahoma City for a graduation that he did not attend, with a return trip by automobile -- added to the trooper's reasonable suspicion, given the Trooper's knowledge concerning the practices of drug couriers. Bui's inability to produce a registration receipt despite the fact that Vo claimed it was in the console added to the trooper's legitimate concerns, as did the information contained on the documents actually produced by Bui.  In sum, the circumstances as a whole gave the officer a reasonable suspicion of criminal activity that justified the detention of the defendants.  The court further finds that the detention was reasonable both in length and in scope, as the evidence shows that the officer appropriately sought to confirm or dispel his suspicions.

B.  *Standing*.  Before addressing defendants' claims that Trooper Heim's searches of the Escalade were unlawful, the court must address the Government's contention that the defendants lack standing to challenge the searches.  Fourth Amendment rights are personal and cannot be claimed vicariously.  *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).  Thus, it is immaterial if evidence sought to be introduced against a defendant was obtained in violation of someone else's Fourth Amendment rights.  *United States v. Rascon*, 922 F.2d 584, 586 (10th Cir. 1990).  A

defendant challenging the lawfulness of a search has the burden of proving that the search violated his individual Fourth Amendment interests. *Id*. The standing inquiry turns on whether the individual manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable. *United States v. Allen*, 235 F.3d 482, 489 (10th Cir.2000).

To establish standing to challenge a car search, the defendant bears the burden of showing that he had a legitimate possessory interest in or a lawful control over the car. *Id*. In meeting this burden, a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself. *United States v. Rubio-Rivera*, 917 F.2d 1271, 1275 (10th Cir. 1990). However, at a minimum, the proponent bears the burden of establishing "that he gained possession from the owner or someone with authority to grant possession." *United States v. Arango*, 912 F.2d 441, 445 (10th Cir.1990). "Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle." *Rubio-Rivera*, 917 F.2d at 1275.

Applying these principles to the case at hand, the court concludes that defendant Vo has established standing to challenges the searches of the vehicle, while defendant Bui has not. The evidence submitted at the suppression hearing was sufficient to show more likely than not that Anh Dang was a co-owner of the Escalade as of May 13, 2006, and that she granted Vo permission to use the vehicle and gave him possession of it. The Government claims Vo failed to satisfy his burden because he did not testify that he had a subjective expectation of privacy in the vehicle. But the court does not read Tenth Circuit law as mandating that a defendant take the stand and make such

an assertion.  *Cf. United States v. Allen*, 235 F.3d 482, (10th Cir. 2000) (noting factors relevant to determining if defendant meets his burden to show standing, including whether he testified to his expectation of privacy).  A number of cases suggest that a defendant satisfies his burden merely by showing that the owner granted him permission to use the vehicle.  *See e.g. Rubio-Rivera*, 917 F.2d at 1275.  In this instance, it is a reasonable inference from the evidence presented that Vo had a subjective expectation that he would be allowed to use the vehicle and to exclude other persons from it based on the owner's permission.  Because such an expectation is one that society would recognize as reasonable, the court concludes Vo has met his burden of showing a reasonable expectation of privacy in the vehicle.  As to defendant Bui, however, there was no evidence to establish that he had any reasonable expectation of privacy in the vehicle.  Ms. Dang testified she did not give Bui permission to use the vehicle and did not even know he would be a passenger.  Tenth Circuit law is clear that a passenger who shows neither a possessory or property interest in the vehicle searched normally does not have a legitimate expectation of privacy in the vehicle.  *See United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (1995); *United States v. Jefferson*, 925 F.2d 1242, 1249 (10th Cir. 1991).  Mr. Bui thus lacks standing and cannot show that any search of the vehicle violated his Fourth Amendment rights.  *Cf. Rakas v. Illinois*, 439 U.S. 128 (1978).  Of course, he does retain the right to challenge the lawfulness of his own detention, *United States v. Nava-Ramirez*, 210 F.3d 1128 (10th Cir.), cert. denied, 531 U.S. 887 (2000) -- but as noted elsewhere in this opinion, the court finds that the trooper's detention of the defendants was reasonable and lawful throughout the course of the stop.

     C.  <u>*Searches of the Vehicle*</u>.  For reasons discussed below, the court finds that at the time the officer first searched the Escalade -- that is, when he leaned into the front passenger area in Bui's

presence and searched the passenger area for documents -- he had probable cause to believe a misdemeanor offense had been committed and that evidence of the offense was located in the area searched. Section 8-127(a) of the Kansas Statutes provides in pertinent part that every owner of a motor vehicle intended to be operated on any highway in Kansas shall, before any such vehicle is operated in the state, apply for and obtain registration in this state, except as otherwise provided law. The violation of this or any other provision of K.S.A. § 8-126 et seq. pertaining to registration of vehicles is a misdemeanor criminal offense. K.S.A. § 8-149. Section 8-138a, a reciprocity statute, provides an exception for nonresident vehicle owners. Such owners, "when duly licensed in [their] state of residence, are hereby granted the privilege of operation of any such vehicle within this state" to the extent reciprocal privileges are granted to Kansas residents by that state. Thus, it would have been a misdemeanor criminal offense to operate the Escalade upon the Kansas highways unless the vehicle was "duly licensed" in the state of Texas at the time of the stop.

Section 503.063 of the Texas Transportation Code provides in part that a authorized car dealer may issue to a person who buys an unregistered vehicle one temporary cardboard buyer's tag, which is valid until (at the latest) the 21st day after purchase. It further provides that the dealer "may issue an additional temporary cardboard buyer's tag to a person after the expiration of 21 days after the issuance of a temporary cardboard buyer's tag, and the person may operate the vehicle for which the tag was issued on the additional temporary cardboard buyer's tag" in certain circumstances.[3]

---

[3] Specifically, the use of a supplemental temporary tag is permitted "if the dealer has been unable to obtain on behalf of the vehicle's owner the necessary documents to obtain permanent metal license plates *because the documents are in the possession of a lienholder who has not complied with the terms of Section 501.115(a) of this code.*" (Emphasis added). The evidence at the suppression hearing was unclear as to whether this particular requirement for issuance of a supplemental tag was met, but the court need not address that issue in light of its conclusion above that the owner was not "duly licensed" for other reasons.

An additional tag issued under the terms of this section is valid for a maximum of 21 days after the date of issue.  At first glance, this might seem to support the defendants' contention that the Escalade was duly licensed and that trooper was mistaken in his belief that a dealer could not reissue the tag. But the regulations adopted by the state of Texas to implement this section further constrain a dealer's authority to issue a supplemental tag.       The Texas administrative regulations provide that at the expiration of an initial buyer's temporary tag, a supplemental temporary buyer's tag may be issued as provided for in Transportation Code Section 503.063.  *See* 43 Tx. Admin Code § 8.139. Section 8.138 of the regulations provides specifications and instructions to car dealers pertaining to initial and supplemental buyer tags.  It authorizes dealers to provide each customer with one initial buyer's temporary tag to be used on untitled new vehicles or used vehicles that have not been registered in the buyer's name for a period not to exceed 21 days from the date the vehicle was sold. The regulations require an initial buyer's tag to be in a particular format with red letters and numerals on a white background.  *Id*., Appendix B-1 & B-2.  The regulations further provide separate instructions and a separate design for a supplemental buyer's tag.  A supplemental tag is required to be in a similar but separate format, with blue letters and numerals on a white background. *Id*., Appendix B-4 & B-4.  An initial tag is required to include the statement, "DEALER MUST APPLY FOR TITLE & REGISTRATION OF VEHICLE WITHIN 20 WORKING DAYS FROM THE DATE SOLD," whereas supplemental tags are required to include the statement, "USE ON MOTOR VEHICLE ONLY WHEN DEALER HAS BEEN UNABLE TO OBTAIN RELEASE OF LIEN." The dealer is required to enter various information on both tags, including the date on which the vehicle was sold.  Dealers were required to be in compliance with the provisions of this section by May 1, 2006.  *Id*.

18

Given these requirements, it appears that Ms. Dang and/or the Escalade were not "duly licensed" in Texas at the time of the stop. The temporary tag was not one authorized by Texas law and it contained a false assertion that the car had been sold on May 4, 2006. Based on the evidence presented, the court finds Trooper Heim obtained facts during his investigation that provided probable cause to believe a misdemeanor offense had been committed in violation of K.S.A. § 8-127(a), 8-138a, and 8-149. Among other things, the officer became aware from his investigation that the car had purportedly been sold on March 31, 2006; that an unknown individual had been cited for an expired registration (apparently for this vehicle) on April 30, 2006; and that another temporary tag had been issued for the car with an expiration date of June 1, 2006 (thus indicating the car had been sold within 20 days of that date, when other documents indicated it was in fact sold before such time). These and the other facts known to the trooper provided reasonable grounds to believe an offense had been committed, even if, as defendants claim, the trooper erroneously believed that Texas law did not permit a car dealer to issue any supplemental buyer's tag. As the Supreme Court explained in discussing probable cause to arrest, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citation omitted). For that reason, "'the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'" *Id*. (*citing Whren v. United States*, 517 U.S. 806, 813 (1996)).[4]

---

[4] The Trooper's testimony at the hearing showed that he learned subsequent to the stop that Texas has certain requirements for supplemental tags, including that they be a different color than the initial tag. As noted above, the fact that the trooper was not aware of such a requirement at the time of the stop does not affect the conclusion that the trooper's actions were objectively reasonable under the facts known to him at the time.

Regardless of the officer's subjective beliefs or understanding of the law, the facts known to him provided probable cause to believe an offense had been committed. *See United States v. Christian*, __ F.3d __, 2006 WL 2328749 (10th Cir., Aug. 11, 2006) ("Probable cause exists where the facts and circumstances within the officers' knowledge, and of which [he has] reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.").

The trooper also had a valid basis to search the Escalade for evidence relating to such an offense. "Probable cause to search a vehicle is established if, under the totality of the circumstances there is a fair probability that the car contains ... evidence [of a crime]." *United States v. Nielsen*, 9 F.3d 1487, 1489-90 (10th Cir. 1993). *See also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (Probable cause for a search exists if there is "a fair probability that contraband or evidence of a crime will be found."). At the time Trooper Heim searched the Escalade, the facts known to him established a fair probability that evidence of the misdemeanor registration offense would be found in the vehicle. It is common knowledge that documents evidencing ownership and registration of a car are typically kept within the vehicle, but Trooper Heim was also specifically told by defendant Vo that the Escalade's registration was in the car. Notwithstanding defendant Bui's subsequent inability to produce a registration and Heim's inability to find such a document in his initial limited search, it was reasonable under the circumstances to believe the vehicle likely contained some documents pertaining to registration or ownership of the car. Moreover, prior to any search by Trooper Heim, defendant Bui had produced one or more documents that were relevant evidence to a registration offense, and there was at least a fair probability the car contained more such documents. Of course, under the "automobile exception" Heim did not need a warrant or the

20

defendants' consent to search for such documents once he had probable cause.  *See California v. Carney*, 471 U.S. 386, 390-91 (1985).  Finally, the court concludes that Heim was entitled to search the entire passenger compartment of the car, since documents pertaining to the vehicle or otherwise constituting evidence of a registration offense might reasonably have been found anywhere within the passenger compartment.  *Cf. United States v. Ross*, 456 U.S. 798 (1982) (probable cause to search for an object in a vehicle justifies search of every part of the vehicle that might contain the object of the search).  In sum, Heim was objectively justified in searching the passenger compartment for documents pertaining to registration regardless of any subjective thoughts he had about the requirements of Texas law.

The evidence also persuades the court that both before Heim entered the vehicle[5] and after he entered it to conduct a lawful search, he noticed that screws in the Escalade's center console showed signs of wear.  Heim knew to look at the screws based on his experience and training, and his experience with hidden compartments and with cars generally led him to conclude that the signs of wear were beyond what one would normally expect to see from the manufacturer.  Heim concluded that the marks on the screws indicated the console had likely been removed after the vehicle was manufactured.  Heim further testified that he was aware from experience and training that a natural void under this sort of console was sometimes used as a hidden compartment by drug traffickers.  Given all of the factors known to the Trooper prior to his removal of the console, the

---

[5] Contrary to defendant Vo's suggestion, Heim's visual examination of the screws while standing outside the vehicle was not an unlawful search.  The officer was lawfully detaining the defendants at that point, and there is no legitimate expectation of privacy with respect to viewing portions of the interior of a car that can be seen by "inquisitive passersby or diligent police officers."  *Texas v. Brown*, 460 U.S. 730, 739-40 (1983).

court concludes that the officer had probable cause to believe the area under the console contained contraband.

Of course, the mere presence of a natural void under the console and the fact that drug traffickers sometimes use such a void to store drugs would not give rise to probable cause.  *See United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004) (probable cause depends on whether there is probative evidence of a hidden compartment and the likelihood that such a compartment would contain contraband).  But the evidence shows that the trooper had reasonable grounds to believe this particular console had been removed.  In challenging the trooper's testimony on this point, the defense argues that the screws from the console do not show sufficient wear to justify the trooper's conclusion.  As an initial matter, the defense has not persuasively demonstrated that the screws produced by Ms. Dang [Defendant's Exhibit Vo B] were in fact the screws from the console.  Aside from doubts about Ms. Dang's credibility generally -- given the dubious circumstances under which she loaned the car to Mr. Vo and her apparent attempts to assist Mr. Vo in her testimony -- the court notes there was also testimony that officers removed numerous other screws from the Escalade as part of a more extensive search after the ecstacy pills were found.  This makes it far from certain that these screws actually came from the console.  But even assuming they did, they in fact support rather than refute the trooper's testimony.  Viewed from straight above, the screws do not appear remarkable, but viewed at an angle the heads on at least two of the screws show sufficient wear to reasonably support the trooper's conclusions.  After considering this and all of the other evidence, the court finds credible the trooper's testimony that his observations, when considered in the light of his experience, indicated the console had been tampered with or removed. And although the removal of the console after manufacture by itself would not necessarily indicate

drug trafficking, the circumstances as a whole established a fair probability that contraband would be found in the console.  In this regard, the court notes the trooper was aware of numerous other suspicious circumstances besides the screws in the console, including the fact that the vehicle had been newly purchased and was improperly licensed; the defendants' uncertain connection to a car owned by a third-party;  the defendants' vague and conflicting versions of their travel itinerary;  the fact that Bui had traveled one-way by air for an event he did not even attend and then returned by automobile with Vo; and the fact that Bui had a prior arrest for possession of a sawed-off shotgun. Taken as a whole, the trooper's search of the console was supported by probable cause and was reasonable.  And once the trooper discovered what he reasonably believed to be a controlled substance, he had probable cause to arrest the defendants.  Finally, inasmuch as the court finds that the trooper's actions were reasonable under the Fourth Amendment, the court rejects the defendants' claims that their post-arrest custodial statements were tainted by an unlawful search or seizure.

IV.  *Conclusion*.

Defendant Vo's motion to join in the Motion of his co-defendant (Doc. 23) is GRANTED. Defendant Vo's and defendant Bui's Motions to Suppress Evidence (Docs. 19 and 21) are DENIED. IT IS SO ORDERED this __4th__ Day of October, 2006, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge